686 A.2d 1130

**Thomas M. MARTIN**

**v.**

**STATE of Maryland.**

**No. 252, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Dec. 30, 1996.

Timothy J. McCrone and Richard O'Connor, Ellicott City, for appellant.

David C. Larson, Assistant Attorney General, Baltimore (J. Joseph Curran, Jr., Attorney General, Baltimore, and Marna McLendon, State's Attorney for Howard County, Ellicott City, on the brief), for appellee.

Argued before *WILNER, C.J., MOYLAN, J., and THEODORE G. BLOOM, Judge of the Court of Appeals (retired), Specially Assigned.

MOYLAN, Judge.

On December 4, 1995, Thomas A. Martin, the appellant, was tried before Judge James B. Dudley, sitting without a jury, in the Circuit Court for Howard County. The appellant was found guilty of committing a second-degree sexual offense, a third-degree sexual offense, and a fourth-degree sexual offense, as well as committing an assault and battery. The trial court sentenced the appellant to three separate four-year terms of incarceration for the second-degree offense, third-degree sexual offense, and the battery charges, and to a one-year sentence for the fourth-degree sexual offense. The trial court ordered that all the sentences be served concurrently.

On appeal, the appellant raises the following issues:

1. Did the trial court commit error in allowing the State to introduce statements made by the appellant during the course of an interrogation?

2. Did the trial court err in ruling that appellant had no standing to contest the search of his police vehicle?

---

* Wilner, C.J., participated in the hearing and decision of this case while an active member of this Court; after being appointed to the Court of Appeals, he was specially assigned to the Court of Special Appeals and participated in the adoption of this opinion.

3. Did the trial court err in finding the evidence sufficient to sustain the appellant's conviction for committing a second-degree sexual offense?

4. Did the trial court err by convicting the appellant based on jurisdiction conferred by Article 27, Section 590?

5. Did the trial court err by improperly drawing an adverse inference from the appellant's decision not to testify at trial?

### *Factual Background*

On August 2, 1995, M.N. attended an Allman Brothers Concert at the Meriweather Post Pavilion in Columbia. During the evening, M.N. consumed large quantities of alcohol and inhaled nitrous oxide, an intoxicating substance, that was being sold at the concert in balloons. Near the conclusion of the concert, M.N. and her male companion went to separate rest rooms. After vomiting for a significant length of time, M.N. left the rest room only to find that her friend was gone. After resting in a nearby wooded area, M.N. began walking away from the concert, unsure of precisely where she was headed. In the process of stumbling through a wooded area, M.N. somehow lost both of her shoes. Eventually, she made her way onto the median strip of Little Patuxent Parkway and began walking in the general direction of her residence in Montgomery County.

Thomas M. Martin, the appellant, who was then serving as a sergeant in the Howard County Police Department, was on duty that night. At approximately 2:30 A.M., the appellant observed M.N. on Little Patuxent Parkway, made a U-turn, and pulled along side of her. The appellant noticed that she appeared disheveled, that she was staggering and barefoot, and that she had the general appearance of being intoxicated. M.N., after seeing the patrol car turn around, believed that she might be in trouble because she was "drunk." The appellant, however, simply asked her where she was going and asked if he could give her a ride. M.N. gladly accepted the ride and sat down in the front passenger seat of the police car. At that point, M.N. felt relieved because she thought she

would be taken home. The appellant did not threaten to arrest her or force her into the police car; he did not display a weapon or refer to it in any way. According to M.N., the appellant was polite and friendly.

From that point on, M.N.'s and the appellant's versions of events differ greatly. M.N. testified that after she had entered the patrol car, she engaged the appellant in friendly conversation. Shortly thereafter, she leaned her head back and fell asleep. She later awoke when the police car came to a stop and she found herself in an unfamiliar "dark area." M.N. could see trees and a small building, and she observed that there were no people in the area.[1] The appellant, to M.N.'s shock, suddenly began to touch her leg, while commenting that she had nice legs. She remained completely silent and motionless in an effort to convince the appellant that she was still asleep. M.N.'s hope was that the appellant would stop of his own accord.

The appellant, however, did not stop. He moved his hands underneath her shorts and began fondling her vagina. The appellant then repeatedly placed his fingers inside M.N.'s vagina, occasionally stopping to ask her if she wanted to go home. M.N. did not physically resist or tell him to stop because she believed that the appellant would hurt her, or even kill her, to prevent her from reporting what was taking place. The appellant was not only physically "bigger" than M.N., but she believed that he, by virtue of being a police officer, was armed with a handgun. The appellant then took out a mini-flashlight, moved M.N.'s shorts out of the way, and shined the flashlight in between her legs. Eventually, the appellant inserted the mini-flashlight into her vagina, moved the flashlight back and forth, and then placed the flashlight in his own mouth. M.N. was gripped with fear and continued to feign sleep. She did, however, keep her eyes partially open in order to see what the appellant was doing.

After a period of time, the appellant got out of the patrol vehicle and walked around to the passenger's side. The

---

1. After the night of the incident, M.N. went to Burtonsville Shopping Center and noticed that the area behind the shopping center looked similar to what she had seen that evening.

appellant reclined M.N.'s seat and took her left leg and placed it on the dashboard so that her legs were spread apart. After positioning M.N., he again placed the flashlight inside her vagina. The appellant also fondled other parts of her body, including her breasts. Throughout the process, the appellant continued to make sexually explicit comments to M.N. concerning her state of arousal.

At one point, the appellant walked away from the patrol vehicle. When asked why she did not attempt to run at that point, M.N. responded, "Well, I remember specifically imagining myself running from the car and I imagined getting shot in the back because I knew he had a gun." The appellant then returned to the patrol vehicle and drove off. M.N. continued to feign sleep and she noticed that they eventually stopped at another dark location. M.N. was still in a reclining position when the appellant proceeded to fondle her vagina again.

The appellant, after finally stopping his sexual conduct, began shaking M.N. and yelling her name. M.N. pretended to wake up because she "didn't want anything worse to happen than had already happened." She looked at the digital clock in the vehicle and observed that it was 4:48 A.M., which was over two hours after she had first been picked up by the appellant. M.N. commented to the appellant that it was late and that she had better get home. The appellant responded by telling her that she had passed out and that he merely let her sleep while he answered a couple of police calls. The appellant even stated, "I thought about taking you back to my apartment and letting you sleep there but I thought you might be a little scared when you woke up." The appellant, after noting that they were near the Howard County and Montgomery County line, finally proceeded to drive her home. After arriving at her home at approximately 5:20 A.M., M.N. asked the appellant his name so that she would know who had sexually assaulted her, and he gave her his business card. M.N. entered the house, went to the bathroom, and then immediately dialed 9–1–1 in an effort to report the incident. M.N. told her mother that she had been molested by a police

officer, and then began to take notes for the purpose of capturing all of the details while they were still fresh in her memory. Throughout the entire ordeal, M.N. conceded that the appellant never brandished his weapon, struck her, physically held her down, or made any other forceful moves. M.N. noted, however, that she had construed his touching her as a threat.

The appellant did not testify at his trial. He gave a very conflicting version of that evening's events, however, while being interrogated by a member of the Howard County Police Department. The appellant there stated that when he picked up M.N., she appeared intoxicated. He informed M.N. that he could give her a ride to the Montgomery County line and that arrangements could then be made for someone from that county to come and get her and take her home. The appellant stated that, while driving toward the Montgomery County line, he learned from M.N. where she lived.

The appellant claimed that at some point between the Little Patuxent Parkway and the Montgomery County line, M.N. passed out. After arriving at the Burtonsville Shopping Center, the appellant reported to the police department that he had "dropped off the female passenger." The appellant conceded that that was not true. During the interrogation, he admitted to having had M.N. in his vehicle for approximately forty-five minutes beyond the time he had reported dropping her off. He claimed that he did so simply to let her sleep. The appellant further stated that, while parked, he was in the middle of the parking lot and that even though no businesses were open, the parking lot was lighted. The appellant acknowledged that he never called the Montgomery County Police or anyone else to meet him and that no other individuals were on the parking lot at that time.

The appellant firmly maintained, however, that there had been no physical contact between him and M.N. except for his periodic shaking of her in order to wake her up. He further stated that after the approximately 45–minute period when he let her sleep, he proceeded to drive her immediately to her

residence. He claimed to have dropped her off a block from her house at approximately 3:30 A.M., which was over two hours earlier than the time when M.N. stated she had been dropped off.

### The Admissibility of the Appellant's Statement

The contention the appellant urges most forcefully upon us is that Judge Dudley erroneously admitted in evidence the statement made by the appellant to Lieutenant John T. Schlossnagle, the Commander of the Criminal Investigations Division of the Howard County Police Department. Initially, one might wonder why the appellant would wish to object to the statement, in that it was almost totally exculpatory, admitting little or nothing that could plausibly be denied, and in that it was, moreover, the only vehicle through which the appellant got his version of events before Judge Dudley. Indeed, the statement may have been better than the appellant's live testimony would have been, shielded as it was from cross-examination. Whether the statement was tactically advantageous to the appellant or not, however, is, of course, beside the point. An opportunity to establish reversible error is its own *raison d'etre,* and the appellant is entitled to pursue such an opportunity.

The appellant argues that his statement should have been suppressed. That initially appeared to be a single blanket contention. As we sought to get a handle on it, however, it turned out to be exasperatingly slippery. Every time we thought we had it pinned down for analysis, it slipped from our grasp and appeared elsewhere in slightly altered form. It behooves us, therefore, to clear up the muddled nature of the question before we even try to answer it.

When the light dawned, we realized that the appellant, without ever expressly saying it and perhaps without even consciously realizing it, was urging upon us not one exclusionary rule but two, a familiar constitutional one and a far less familiar statutory one. The problem was that his argument wandered confusingly back and forth across the line between

two exclusionary principles that focus on different problems and are implemented in different ways. The argument inadvertently sought to mix two distinct exclusionary approaches that do not mix. We must at the outset, therefore, isolate two very dissimilar subcontentions and then analyze each in its appropriate doctrinal vacuum.

There is first the familiar exclusionary rule, based on both the federal and the Maryland constitutions and insisting on traditional voluntariness. The focus of that exclusionary principle is on the subjective state of mind of the person giving an incriminating statement. The objective actions of the interrogators, no matter how reprehensible, do not per se trigger exclusion. They have significance only to the extent to which they actually produce a causative or catalytic impact upon the person being interrogated, compelling him to be a witness against himself. The ultimate concern is with the volition of the person being interrogated, not the conduct of the interrogator. For convenience of reference, we will call this the constitutional exclusionary rule.

The appellant has also invoked, indirectly if not directly, a less familiar statutory exclusionary rule, based on the Law Enforcement Officers' Bill of Rights (hereinafter "LEOBOR"), which is found at Md.Ann.Code, art. 27 §§ 727 through 734D. It deals, under certain specifically designated circumstances, with an interrogation of a police officer by another police officer. The focus of its exclusionary principle, by way of contrast with the constitutional exclusionary rule, is on the objective conduct of the officer conducting the interrogation. If the interrogator does certain things, the exclusion of any ensuing statement will automatically be triggered as a rule of law. The subjective impact upon the person being interrogated has nothing to do with it. Like the exclusionary rule for a Fourth Amendment violation, this is a prophylactic rule focusing on police conduct per se. The ultimate concern is with the objective conduct of the interrogating officer, not the subjective impact of that conduct on the will of the person being interrogated. For convenience of reference, we will call this the statutory exclusionary rule.

Because this LEOBOR-based statutory exclusionary rule is less familiar than the constitutional exclusionary rule, it will be helpful to have it before us as we discuss the circumstances of the appellant's interrogation. The LEOBOR provides, in pertinent part:

This subtitle does not prevent any law enforcement agency from requiring a law enforcement officer under investigation to submit to ... interrogations which specifically relate to the subject matter of the investigation. This subtitle does not prevent a law enforcement agency from commencing any action which may lead to a punitive measure as a result of a law enforcement officer's refusal to submit to ... interrogation, *after having been ordered to do so* by the law enforcement agency. The results of any ... interrogation, as may be required by the law enforcement agency under this subparagraph are not admissible ... in any criminal proceedings against the law enforcement officer *when the law enforcement officer has been ordered to submit thereto.* (Emphasis supplied).

Md.Ann.Code art. 27, § 728(b)(7)(ii) (1996).

## A. *The Circumstances of the Interrogation*

On August 3, 1995, at approximately 6:30 A.M., shortly after M.N. had been returned to her home, Lieutenant John T. Schlossnagle, the Commander of the Criminal Investigations Division of the Howard County Police Department, was informed of the sexual assault complaint made by M.N. against the appellant. Lieutenant Schlossnagle drove to the Southern District, where the appellant and his police vehicle were located at the time. Upon arriving at the Southern District, Lieutenant Schlossnagle observed the appellant sitting in the Watch Commander's office. Lieutenant Schlossnagle informed the appellant that he was conducting an official criminal investigation based on a sexual assault allegation made by a female. Lieutenant Schlossnagle asked the appellant if he had any objection to giving a statement, and the appellant replied either "sure" or "no problem." In either event, ac-

cording to Lieutenant Schlossnagle, the appellant "readily agreed without hesitation" to answer questions.

The interrogation took place at approximately 8:45 A.M., which was only several hours after the incident was alleged to have occurred. The interrogation was conducted exclusively by Lieutenant Schlossnagle, and the entire conversation was tape-recorded. At the suppression hearing, Judge Dudley was provided with a transcribed version of the interrogation. The transcript reveals that the appellant, from the very outset, was not only willing to give a statement, but also was very knowledgeable about his right to refuse to answer any questions.

Lieutenant Schlossnagle:

Tom, we've had just a very brief conversation.... we haven't had any conversation. I want to clarify that. You were in Lt. McKeldin's office at Southern District. In the Watch Commander's Office, talking to Lt. McKeldin, I came down.... and clarify me if this is not accurate. I came down with Sgt. D'Antuono, I informed you that there's been an allegation against you in a criminal matter involving sexual misconduct in a police car which occurred last evening or earlier this morning. I informed you that we were doing an official criminal investigation. *And I informed you that your option is.... either you could voluntarily give us a statement and answer some questions right now, or you can refuse to answer any questions at this point. And you indicated you were willing to talk. Is that correct.*

Sgt. Martin:

*Yes sir.*

Lieutenant Schlossnagle:

This interview is being tape recorded. Under Maryland Law Enforcement Officer's Bill of Rights, you are entitled to certain things. I have to notify you of an official investigation and I have to give you your Law Enforcement Officers Rights in which you know as a supervisor, you've had this training, and you also investigate other officers. So you know that it's a required....

Sgt. Martin:

Yes Sir.

Lieutenant Schlossnagle:

. . . .it is not to be inferred that you have done anything wrong. But it's required by State law. Anytime we interview a police officer where he could be subject to criminal penalties or termination. . . .

Sgt. Martin:

Sir, I'm aware of that.

Lieutenant Schlossnagle, in an effort to comply with the requirements of Article 27, § 728(b), then provided the appellant with a Notice of Investigation that informed the appellant that he was being investigated regarding allegations that he had sexually assaulted a female while on duty. The appellant was also informed that Lieutenant Schlossnagle was in charge of the investigation, and that he was the only one who would ask the appellant questions.

The conversation between Lieutenant Schlossnagle and the appellant continued:

Lieutenant Schlossnagle:

*Now the other form I have here Tom, is an explanation of the Officer's Bill of Rights. I can either read these to you verbatim or you can waive the reading of the rights.* And basically, your *Miranda* Rights or not *Miranda* Rights, but L.E.O.B.R. says such things as:

The interview has to be conducted while on duty; It has to be conducted either at your assigned duty station or at the Headquarters Unit; The interview has to be tape recorded; It says you are entitled to have an attorney present, things of that nature.

So, I'm prepared to read these to you unless you decide you'd like to. . . .you are going to. . . .

Sgt. Martin:

*No. I'll waive 'em. I've read 'em my self enough.*

Lieutenant Schlossnagle:

Okay.

Sgt. Martin:

*I don't know them by heart, but I know 'em.*

The appellant was given Howard County Police Department Form 1727, which is designed to outline the various rights and responsibilities the appellant has, pursuant to the LEOBOR, when being investigated by a law enforcement agency for any reason that could lead to disciplinary action. Section 7.a. of this form states that law enforcement agencies may require an officer under investigation to submit to interrogations specifically related to the subject matter of the investigation. Section 7.b. states that failure to submit to these interrogations may result in the commencement on the part of the law-enforcement agency of action that may lead to punitive measures. Finally, section 7.c. explained that the results of any interrogation of a law enforcement officer, when that officer has been ordered to submit thereto, are not admissible in any criminal proceeding against the law-enforcement officer.

Lieutenant Schlossnagle then turned his attention to giving to the appellant a *Miranda* advisement.

Lieutenant Schlossnagle:

Okay, Tom, the other requirement by law is that any time an officer is under interrogation for a criminal matter, *I have to give you your . . . . also your Miranda Rights. Even though you're . . . . you are not in custody, and I want to make this clear, this is a voluntary interview.*

Sgt. Martin:

*I understand.*

After questioning the appellant as to his sobriety and educational background, Lieutenant Schlossnagle informed the appellant of his right to remain silent, that anything he said might be used against him in court, that he had a right to a lawyer before and during questioning, and that a lawyer would be appointed for him if he could not afford one. The appellant stated that he fully understood those rights, and the following then took place:

Lieutenant Schlossnagle:

*And having been advised of your rights, are you willing to answer questions?*

Sgt. Martin:

*Yes I am.*

After briefly leaving the room to talk to another officer, Lieutenant Schlossnagle returned and once again ensured that the advisement was proper:

Lieutenant Schlossnagle:

Tom, I just want to make sure you understand your rights. The interrogations are supposed to be conducted while you on duty. And you are not on duty. *You got off duty at 8:30 and you are voluntarily waiving that right in staying here of your own free will. Is that correct?*

Sgt. Martin:

*Correct. Yes.*

Lieutenant Schlossnagle:

Okay.

And you're waiving the right to having an attorney or any consultations with an attorney. Is that correct?

Sgt. Martin:

Yes.

The appellant then proceeded to answer all of the questions posed by Lieutenant Schlossnagle.

### B. *Miranda v. Arizona: A Non–Issue*

The appellant, with good reason, does not allege any failure of compliance with the provisions of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Although the *Miranda* advisements and warnings were gratuitously given to the appellant, they were not necessary. The *Miranda* requirements must be satisfied only in the circumstance of custodial interrogation. Although the appellant's statement was unquestionably in response to interrogation, the appellant was not in custody. *Miranda* was, therefore, inapplicable. *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Oregon v. Mathiason,* 429

U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

## C. *Admissibility Under the LEOBOR*

The LEOBOR, enacted by the Legislature in 1974, is designed primarily to guarantee substantive and procedural protection to law enforcement officers during disciplinary investigations, interrogations, and hearings. *Abbott v. Administrative Hearing Bd.*, 33 Md.App. 681, 682, 366 A.2d 756, *cert. denied*, 280 Md. 727 (1977). This is because "the nature and duties of police officers is different from that of other public employees." *Cancelose v. City of Greenbelt*, 75 Md.App. 662, 666, 542 A.2d 1288 (1988). Indeed, "[i]n enacting the LEOBOR, the Legislature vested in law-enforcement officers certain 'rights' not available to the general public." *Nichols v. Baltimore Police Dep't*, 53 Md.App. 623, 627, 455 A.2d 446, *cert. denied*, 296 Md. 111 (1983).

The appellant invokes only the exclusionary principle of § 728(b)(7)(ii). He does not contend that any other aspect of the LEOBOR was not complied with. The exclusionary rule, already quoted more fully above, when reduced to its essentials, provides:

The results of any ... interrogation, *as may be required by the law enforcement agency* under this subparagraph are not admissible ... in any criminal proceedings against the law enforcement officer *when the law enforcement officer has been ordered to submit* thereto. (Emphasis supplied).

The objective fact that must be established before this prophylactic exclusionary rule is triggered is that the interrogating officer *ordered* the appellant to respond to the interrogation. Peripheral psychological pressures do not suffice. The subjective state of mind of the appellant is immaterial. As an historical fact, Lieutenant Schlossnagle either ordered the appellant to respond to interrogation or he did not.

We agree with Judge Dudley that there was absolutely no evidence that the appellant was *ordered* to submit to the interrogation by the Howard County Police Department. In

fact, the overwhelming evidence supports his finding to the contrary. Lieutenant Schlossnagle testified that the appellant was never threatened with a transfer, dismissal, demotion, or any other type of disciplinary action for failing to give a statement. The appellant was free to leave, but he voluntarily chose to stay and give his version of events. At the outset of the interrogation, Lieutenant Schlossnagle explicitly advised the appellant:

> I informed you that your option is.... either you could voluntarily give us a statement and answer some questions right now, or you can refuse to answer any questions at this point.

That, most definitely, was not an order. The critical difference between a request and an order is a familiar distinction to anyone, such as the appellant here, in a paramilitary chain of command. Forced compliance with a direct order has attendant consequences that merely acceding to a request does not. A familiar question by one in the ranks is, "Am I being ordered to do so?"

The appellant had even agreed to give a statement before being advised of his LEOBOR responsibilities. Indeed, the appellant conceded at the pretrial suppression hearing that in fact he had never been ordered to give a statement. We hold that the statutory exclusionary rule established by the LEOBOR did not come into play.

### D. *Constitutional Admissibility and Traditional Voluntariness*

The appellant also contends that notwithstanding the inapplicability of any *Miranda* requirements, his statement should have been suppressed because it failed the traditional voluntariness test and thereby violated his Fifth Amendment privilege against compelled self-incrimination, made applicable to the states through the Fourteenth Amendment's Due Process Clause. The test of voluntariness was well expressed by *Arizona v. Fulminante,* 499 U.S. 279, 303, 111 S.Ct. 1246, 1261, 113 L.Ed.2d 302, 327 (1991), quoting *Culombe v. Con-*

*necticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961):

> "The ultimate test remains that which has been the only clearly established test in Anglo–American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

Looking at the totality of the circumstances, Judge Dudley concluded that the appellant's will was not overborne and that his capacity for self-determination was not critically impaired. As part of our own independent, reflective determination of the ultimate conclusory fact, we similarly conclude that the appellant's statement did not fail the traditional voluntariness test. We agree in this regard with the specific finding made by Judge Dudley:

> The question is, as a matter of fact, does the Court find that the statement made by Sgt. Martin was freely, voluntarily made with full knowledge of his legal rights by virtue of *Miranda* and his legal rights by virtue of the Law Enforcement Officer's Bill of Rights. And in listening to the tape and the manner in which he answered the questions, and in view of the [questions] which were posed and his responses to the questions, *the Court has no doubt that Officer Martin was thoroughly familiar with all the rights and gave his statement freely and voluntarily.*

Just as the appellant sought (unsuccessfully) to invoke the allegedly intimidating nature of being interrogated by an occupational supervisor to trigger the LEOBOR-based exclusionary rule of § 728(b)(7)(ii), he also seeks to invoke the allegedly intimidating nature of such an interrogation to trigger suppression on the ground that any statement under such circumstances is involuntary. Recognizing the essential futility of attacking Judge Dudley's ruling on voluntariness on its general merits, the appellant seeks to avoid the general merits

by invoking *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) and *Holloway v. State,* 26 Md.App. 382, 339 A.2d 319 (1975). He cites those two cases as ostensible support for the proposition that certain occupational threats made by superior officers to a policeman will trigger a *per se* and prophylactic rule of exclusion that will automatically "trump" the general test of voluntariness.

The appellant testified at the pretrial suppression hearing that because of the advisement given him with respect to his LEOBOR rights and responsibilities, he gave a statement because he feared that he would be dismissed from employment if he refused to talk. He argues that *Garrity* and *Holloway* dictate that a statement given under such circumstances must be treated as involuntary as a matter of law.

We hold that the appellant's reliance on *Garrity* and *Holloway* is misplaced for several independent reasons, any one of which would defeat his claim that his statement should have been suppressed.

### *1. The Factual Analogy Is Not Present*

Even assuming that the suppression of a challenged statement pursuant to *Garrity* or *Holloway* would function in the automatic way suggested by the appellant (we hold, *infra,* that it does not), the appellant here would fail to qualify for such automatic exclusion on factual grounds. The suspects in both the *Garrity* and the *Holloway* cases were expressly threatened with the loss of employment if they failed to give statements; the appellant here was not.

In *Garrity v. New Jersey,* a number of police officers were being investigated for "fixing" traffic tickets. Prior to being questioned, each officer "was warned (1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that *if he refused to answer he would be subject to removal from office.*" (Emphasis supplied). 385 U.S. at 494, 87 S.Ct. at 617. The police officers, therefore, were confronted with the stark

choice of incriminating themselves or losing their jobs. 385 U.S. at 496, 87 S.Ct. at 618. The question before the Supreme Court was whether being placed on the horns of such a dilemma deprived the officers of their " 'free choice to admit, to deny, or to refuse to answer.' " 385 U.S. at 496, 87 S.Ct. at 618 (quoting *Lisenba v. California,* 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166 (1941)).

The Supreme Court held that the police officers could not be held to have given voluntary statements in such a situation because "the option to lose their means of livelihood or to pay the penalty of self-incrimination is the antitheses of free choice to speak out or remain silent." 385 U.S. at 497, 87 S.Ct. at 618. Indeed, the Supreme Court explained that "[w]here the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other." 385 U.S. at 498, 87 S.Ct. at 619 (quoting *Union Pac. R.R. Co. v. Pub. Service Comm.,* 248 U.S. 67, 70, 39 S.Ct. 24, 25, 63 L.Ed. 131 (1918)).

In *Holloway v. State,* an investigation was being made into the theft of a large quantity of heroin from the property room of the Baltimore City Police Department. Holloway, a Baltimore City Police Officer, was interrogated several times about the missing heroin. Holloway contested the admissibility of his statements, alleging that a police department policy existed that stated that if a member of the department refused to give a statement to a superior officer when ordered or requested to do so, he would face disciplinary action and possible termination of employment. Based on those facts, this Court, albeit by way of *dicta,* observed that "the statements were involuntary as a matter of law, because of the existence of a departmental policy of disciplining those who refused to give such statements." *Holloway,* 26 Md.App. at 388, 339 A.2d 319. We reasoned that the case was "controlled by the decision of the Supreme Court in *Garrity v. New Jersey.*" *Id.*

The appellant argues that both of those cases hold that when a police officer is threatened with administrative discipline for refusing to give a statement, then the statement

cannot be considered to have been freely and voluntarily given as a matter of law. The appellant argues, therefore, that the trial court erred in admitting his statements at trial because he had been informed that he could be subject to disciplinary action if he refused to give the statements.

The obvious flaw in the appellant's argument is that its factual predicate was never established. Unlike the situations in *Garrity* and *Holloway*, the appellant was never threatened with the loss of a job or any other disciplinary action if he chose to remain silent. Again, unlike the situations in *Garrity* and *Holloway*, the necessary precondition did not exist to bring some occupational sanction to bear on the appellant. As we explained at length in the context of the LEOBOR-based contention, the appellant was never required, much less ordered, to give a statement to the Howard County Police Department. Without having been ordered to give a statement, he was, therefore, never in any danger of facing disciplinary action if he chose to remain silent.

The absence of any express threat and the absence of any automatic (or even likely) occupational sanction for the appellant's remaining silent make *Garrity* and *Holloway* completely inapposite to the situation at bar.

## 2. *Garrity Does Not Establish a Rule That Is Either Prophylactic in Purpose or Per Se in Application*

■ Even if *Garrity* and *Holloway* were factually apposite to the case before us, however, the appellant would still be incorrect in arguing that those cases dictate *automatic* exclusion.[2] The flaw in the appellant's approach is that of a blurred analytic focus. At times he complains of the compelling or coercive effect that the fear of a job loss subjectively had on his choice to remain silent. When faced, however, with Judge

---

**2.** Our disposition of the appellant's contention on other grounds does technically make this subsection of this opinion unnecessary. Because we believe, however, that *Garrity* and *Holloway* are being cited for an admittedly plausible but ultimately incorrect proposition, it behooves us to try to lay the ghost of that incorrect exclusionary principle to rest.

Dudley's explicit findings of fact that his statement was voluntarily made and completely free of any imagined fear of occupational reprisal, he switches glibly into a completely different gear and complains that the objective behavior of the interrogating officer automatically called for suppression as a matter of law, quite regardless of whether it had any actual subjective impact on him or not. It is for this purpose that he seeks to exploit *Garrity* and *Holloway.*

The appellant, however, may not wander back and forth between two or three distinct and disparate approaches. He may, to be sure, make multiple exclusionary arguments— provided they are made one at a time—but he may not combine two or three very different exclusionary principles into a single omnibus argument.

When confronted, therefore, with a contention such as the appellant's claim that his statement was unconstitutionally involuntary, we cannot undertake a principled analysis until we have first selected the proper analytic focus. Is it an objective focus simply on what happened? Or is it a subjective focus from inside the defendant's head? Are we primarily interested in "policing the police" or in protecting the defendant? Are we being asked to apply an undeviating rule of broad application or a fact-specific remedy tailored *ad hoc* to one defendant on one occasion? Until we have selected our proper doctrinal microscope we cannot begin our examination, for factors that might move us under one mode of analysis may be reduced to matters of blithe unconcern under another mode of analysis.

Before any clean analysis may begin, there are several distinctions that must be recognized and several approaches that must be sorted out. There is first the question of the purpose of an exclusionary rule. Is it prophylactic or is it remedial? Then there is a distinct question as to the manner of applying an exclusionary rule. Whether the purpose be prophylactic or remedial, do some circumstances sometimes call for the *per se* application of the rule or should its application always be decided on an *ad hoc* basis by looking at

the totality of the circumstances? Generally speaking, a prophylactic exclusionary rule is objective in its focus and *per se* in its application. An exclusionary rule that is remedial in purpose, by contrast, is generally subjective in focus and almost always, albeit not universally, calls for an *ad hoc* rather than a *per se* application. Let us turn first to the question of a rule's purpose.

### a. The Exclusion of a Compelled Confession is Not Prophylactic

Some exclusionary principles are concerned with an objective appraisal of governmental conduct itself. Such an approach leads, as with the Fourth Amendment's exclusionary rule, to a prophylactic sanction that is designed to deter inappropriate investigative behavior. Given the governmental misbehavior, such a rule applies automatically as a matter of law and is unconcerned with the subjective impact that the forbidden conduct may have on a particular defendant on a particular occasion. A classic example of a prophylactic exclusionary sanction is the Fourth Amendment exclusionary rule established by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). It is not aimed at making the victim of an unreasonable search whole. Its purpose is "to police the police," to deter future unreasonable searches and seizures for the greater good of "the People" generally. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Its design is more to regulate governmental behavior than to protect an aggrieved defendant from adverse consequences.

By contrast, an exclusionary rule that is remedial in purpose is aimed at protecting the constitutional rights of an individual defendant. The contrast between a violation of the Fourth Amendment and a violation of the Fifth Amendment privilege is illuminating. When police officers perpetrate an unreasonable search or seizure, the Fourth Amendment violation is a *fait accompli;* what the impact may be on an individual defendant is immaterial. In the case of the Fifth Amendment privilege, by contrast, the most outrageous police conduct employed in an attempt to extract a compelled confession is

not, in and of itself, a violation of the Fifth Amendment privilege. That violation does not occur unless and until the target "person" is actually "compelled ... to be a witness against himself." Warrantlessly to smash in a door may be a Fourth Amendment violation *per se.* To torture a suspect is not; it is only when the suspect responds to the torture that the Fifth Amendment privilege is violated.[3] That is the classic difference between objective and subjective focus.

When *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) announced the equation between Fourteenth Amendment involuntariness and Fifth Amendment compulsion and first made the Fifth Amendment privilege applicable to the states, it made very clear that the focus of the Fifth Amendment privilege is on the subjective impact that official conduct has on an individual defendant:

> Under this test [whether a person has been "compelled ... to be a witness against himself"], the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was "free and voluntary." ... In other words the person must not have been compelled to incriminate himself.

378 U.S. at 7, 84 S.Ct. at 1493 (citations omitted).

The resolution of the first question before us, therefore, is easy. In contending that his statement to his police superior should have been suppressed because it was involuntary, the appellant is clearly arguing for a remedial exclusionary rule and not a prophylactic one. Both the *Garrity* and *Holloway* situations are now grounded in the Fifth Amendment privilege. Exclusion pursuant to it is remedial, not prophylactic.

---

**3.** This is not to say that such investigative behavior might not violate the Due Process Clause of the Fourteenth Amendment, the criminal law of Maryland, the Mosaic Code, the Code of Hammurabi, and the United Nations Charter. It is only to say that it would not, until it actually produces the desired result, violate the Fifth Amendment privilege against compelled self-incrimination.

### b. The Fifth Amendment Privilege Does Not Lend Itself to Per Se Exclusion

That tilts us decidedly away from the purely objective focus and the *per se* application that the appellant urges on us, but not conclusively so. Even within the smaller universe of remedial exclusionary rules, there is sometimes a *per se* application based on an objective focus, although most of the time there will be an *ad hoc* application based on the totality of the circumstances as they come to bear subjectively on a defendant. Even when the purpose in applying an exclusionary rule is indisputably to protect the defendant, there are certain contexts that trigger a *per se* application of the rule in lieu of an *ad hoc* determination as to whether it is necessary. Instead of measuring actual impact on, or prejudice to, a particular defendant, the prejudice is conclusively presumed.

In confession cases, such a *per se* application is the approach taken when a challenged confession offends the Sixth Amendment right to the assistance of counsel or when it violates the judicially-devised and purely implementing rules of *Miranda v. Arizona* (as opposed to a violation of the undergirding Fifth Amendment privilege against compelled self-incrimination itself). (For the difference in focus employed when examining a violation of the implementing rule and when examining a violation of the undergirding constitutional principle, *see Oregon v. Elstad,* 470 U.S. 298, 304–07, 105 S.Ct. 1285, 1290–92, 84 L.Ed.2d 222, 229–31 (1985); *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984).)

The *per se* exclusion in the case of a violation of the Sixth Amendment right to counsel and the limited *per se* exclusion from the State's case in chief for a violation of the *Miranda* rules are dependent, however, not simply on the conclusive presumption of prejudice. An equally significant reason for the *per se* application is the administrative convenience and judicial time saving accomplished by virtue of a standardized or uniform rule. The "bright line formula" approach makes for easy and efficient administration.

By way of sharp contrast, the determination of whether a challenged confession was involuntary under the general due process clause of the Fourteenth Amendment (applicable to cases coming out of the state courts prior to 1964) or is compelled within the contemplation of the Fifth Amendment privilege against compelled self-incrimination (recognized to be applicable to federal cases at least since 1897 and to both federal and state cases since 1964), has always been an *ad hoc* inquiry depending on the totality of the circumstances. Objectively viewed investigative behavior does not, *ipso facto,* give rise to a conclusive presumption of prejudice. The resolution of the issue always requires a subjective focus on an individual defendant.

When the subjective focus is thus on the defendant, the governmental conduct itself, no matter how outrageous, is of only indirect legal significance and matters only to the extent that it is determined to have been the catalytic agent that effectively produced the confession. Precisely the same investigative misbehavior, therefore, may well produce the exclusion of the confessions of certain defendants while not necessitating the exclusion of the confessions of other similarly situated but better endowed defendants. Even with an offensive interrogation technique as an immutable constant, the confessions of those who are 1) of tender age, 2) psychologically fragile, 3) of borderline I.Q., or 4) inexperienced with the law may well be the compelled products of a "will overborne," whereas the confessions of others who are 1) more mature, 2) psychologically stronger, 3) of richer intellectual endowment, or 4) more "savvy" in the ways of the law may well be the non-compelled products of a "free will." Faced with precisely the same intimidation, some stout wills remain free while others are easily overborne.

The focus is not on whether the investigative conduct would generally be compelling to most subjects or even on whether the interrogators meanly and maliciously intended to compel a confession, but exclusively on whether the particular confession in issue was in fact compelled. Under such an approach, *per se* exclusion is never automatically called for as a matter of

law. There is always a factual question as to the actual causative effect of the official conduct on the unique confession of a unique suspect.

In addressing the appellant's contention that his statement was unconstitutionally involuntary, our focus will very definitely be subjective. Our concern is with whether there was a violation of the Fifth Amendment privilege against compelled self-incrimination, made applicable to the states through the due process clause of the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Under such an analysis, the terms "compelled" and "involuntary" are synonymous. In bringing the review of challenged "involuntary" confessions in state court cases under the coverage of the specific Fifth Amendment privilege, *Malloy v. Hogan* observed:

> [T]oday the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in *Bram v. United States* [168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897)] ... the Court held that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'"

378 U.S. at 7, 84 S.Ct. at 1493 (citation omitted).

The equation of an "involuntary confession" with a "compelled confession" is clear. In *Reynolds v. State,* 88 Md.App. 197, 215, 594 A.2d 609 (1991), *aff'd,* 327 Md. 494, 610 A.2d 782 (1992), this Court traced the parallel histories of "involuntariness" under the Fourteenth Amendment and "compulsion" under the Fifth Amendment and discussed the identity of the two terms:

> Whereas the criterion for determining inadmissibility in a state trial was involuntariness within the contemplation of the due process clause, the counterpoint criterion for deter-

mining inadmissibility in a federal trial was compulsion within the contemplation of the Fifth Amendment privilege. *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

A doctrinal marriage was made in 1964 when the Supreme Court overturned half a century of precedents and held that the Fifth Amendment privilege was incorporated into the Fourteenth Amendment. *Malloy v. Hogan.* Although *Malloy v. Hogan* did not itself deal with a confession, it supported its incorporation argument by pointing out that a large part of the Fifth Amendment privilege, that prohibiting compelled confessions, was already applicable to the states by virtue of the Fourteenth Amendment's ban upon involuntary confessions.

. . .

It was clear that a compelled confession according to the Fifth Amendment and an involuntary confession according to the Fourteenth Amendment were one and the same.

(citations omitted). *See also Hof v. State,* 97 Md.App. 242, 269, 629 A.2d 1251 (1993), *aff'd on other grounds,* 337 Md. 581, 655 A.2d 370 (1995) [4] (*"Bram [v. United States ]* left no doubt that the test of voluntariness, now embodied within the Fifth Amendment privilege, was the traditional common law test of voluntariness.")

The broad sweep of the Fifth Amendment privilege cases makes it very clear that the question of whether a statement is compelled calls for an *ad hoc* determination with a focus exclusively on the subjective state of mind of the defendant giving the statement. In *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the Court held that notwithstanding mere-*Miranda* violations that called for the *per se* exclusion of a confession from the State's case in chief, a subjective focus on the defendant under the totality of the circumstances revealed that the undergirding Fifth Amend-

---

**4.** The Court of Appeals did not, however, express disagreement with the historical analysis.

ment privilege had not been violated and that the exclusion of derivative evidence under the "fruit of the poisonous tree" doctrine was, therefore, not appropriate. The Court observed:

> [T]he police conduct here did not deprive respondent of his privilege against compulsory self-incrimination as such, but rather failed to make available to him the full measure of procedural safeguards associated with that right since *Miranda*. Certainly no one could contend that the interrogation faced by respondent bore any resemblance to the historical practices at which the right against compulsory self-incrimination was aimed.

417 U.S. at 444, 94 S.Ct. at 2364.

> Our determination that the interrogation in this case involved *no compulsion sufficient to breach the right against compulsory self-incrimination* does not mean there was not a disregard, albeit an inadvertent disregard, of the procedural rules later established in *Miranda*.

417 U.S. at 445, 94 S.Ct. at 2364 (Emphasis supplied).

> But we have already concluded that the police conduct at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in *Miranda*.

417 U.S. at 445–46, 94 S.Ct. at 2364.

In *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238, 245 (1977), the Supreme Court expressly referred to the "totality of the circumstances" as the appropriate test for determining whether a statement had been compelled:

> The constitutional guarantee is only that the witness be not *compelled* to give self-incriminating testimony. The test is whether, *considering the totality of the circumstances*, the free will of the witness was overborne. *Rogers v. Richmond* [365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760] (1961).

(First emphasis in original; other emphasis supplied; citation omitted).

In *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550, 555 (1984), the Supreme Court made it clear that the Fifth Amendment privilege has not been violated unless the damaging admission has actually been "coerced":

> The Fifth Amendment itself does not prohibit all incriminating admissions; "[a]bsent some officially *coerced* self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions."

(Emphasis in original).

In *Oregon v. Elstad,* 470 U.S. 298, 306–07, 105 S.Ct. 1285, 1291–92, 84 L.Ed.2d 222, 230–31 (1985), the Supreme Court again held that although a *Miranda* violation may call for the *per se* exclusion of a statement from the State's case in chief, such a statement will not be barred for other purposes unless it is determined that it was actually "compelled":

> The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion....
>
> But the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted.

(Emphasis in original; citations omitted).

In *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), Justice O'Connor was dealing not with the voluntariness of an ultimate confession itself but, in terms of the appropriate analysis, the indistinguishable voluntariness of a *Miranda* waiver. The Court accepted, *arguendo,* the fact that the police may have engaged in highly reprehensible conduct in keeping an attorney from contacting his client, Burbine. In eschewing any *per se* exclusion based on the police conduct itself and in emphasizing the highly subjective nature of the voluntariness decision, the Court in effect said that what the defendant does not know will not hurt him:

> [T]he state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election

to abandon his rights. Although highly inappropriate, *even deliberate deception of an attorney could not possibly affect a suspect's decision* to waive his *Miranda* rights *unless he were at least aware of the incident.*

475 U.S. at 423, 106 S.Ct. at 1142 (emphasis supplied). The Court's opinion stressed the fact that in dealing with the privilege against compelled self-incrimination, the only pertinent criterion is the impact that official activity may have on a defendant's subjective state of mind:

> At the outset, while we share respondent's distaste for the deliberate misleading of an officer of the court, reading *Miranda* to forbid police deception of an *attorney* "would cut [the decision] completely loose from its own explicitly stated rationale." *Beckwith v. United States,* 425 U.S. 341, 345 [96 S.Ct. 1612, 1615, 48 L.Ed.2d 1] (1976). As is now well established, "[t]he ... *Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the [suspect's] right against compulsory self-incrimination [is] protected.'" *New York v. Quarles,* 467 U.S. 649, 654 [104 S.Ct. 2626, 2630, 81 L.Ed.2d 550] (1984), quoting *Michigan v. Tucker,* 417 U.S. 433, 444 [94 S.Ct. 2357, 2364, 41 L.Ed.2d 182] (1974). Their objective is not to mold police conduct for its own sake. *Nothing in the Constitution vests in us the authority to mandate a code of behavior for state officials wholly unconnected to any federal right or privilege.* The purpose of the *Miranda* warnings instead is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights. Clearly, a rule that focuses on how the police treat an attorney—*conduct that has no relevance at all to the degree of compulsion experienced by the defendant during interrogation*—would ignore both *Miranda*'s mission and its only source of legitimacy.

475 U.S. at 424–25, 106 S.Ct. at 1142–43 (first emphasis in original; other emphasis supplied).

In *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473, 482 (1986), the Supreme Court again made the point that an objective view of police conduct itself will not give rise to the *per se* exclusion of a challenged confession but that what is required is a causal connection between the police conduct and the resulting confession:

> Absent *police conduct causally related to the confession,* there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

(Emphasis supplied; footnote omitted).

In the path of this juggernaut of Fifth Amendment authority to the contrary, the appellant continues to maintain that *Garrity* and *Holloway* call for *per se* exclusion. To simplify our analysis, it will be helpful to reduce the duality of *Garrity* and *Holloway* to the singularity of *Garrity.* The language relied on by the appellant from *Holloway v. State* was *dicta.* Holloway's conviction was actually affirmed. His challenges to two of his three confessions were held to be not preserved for appellate review. The third confession was held to be cumulative and its admission no more than harmless error. In *Holloway,* moreover, there was no question before the Court as to objective versus subjective focus or as to *per se* exclusion versus a totality-of-circumstances determination. *Holloway* simply followed what it believed to be the rule of *Garrity.* To the extent to which *Holloway* suggests any exclusionary principle contrary to that which we announce in this opinion, *Holloway* is expressly disavowed.

The appellant argues that *Garrity* mandates *per se* exclusion. The proper question, however, is not whether *Garrity* calls for *per se* exclusion. The *Garrity* situation would today be a Fifth Amendment privilege case. The proper question should be whether the Fifth Amendment privilege calls for *per se* exclusion. As has been comprehensively established, it does not. Before seizing on a few random words from an isolated case and treating them as Holy Writ, therefore, attorneys should strive for a larger perspective. If when one surveys the broad ranks of the Fifth Amendment cases, one

spots a maverick (*Garrity*—perhaps) that seems to be wandering off in an eccentric direction, it should obviously be seen as a very risky guide to follow. Absent some cogent explanation as to why it is marching to a different drum, the overwhelming likelihood is that it is simply an inadvertent and embarrassing anomaly.

One can dismiss the proposition for which the appellant cites *Garrity* in a number of ways. For starters, it is by no means certain that *Garrity* necessarily stands for *per se* exclusion. In terms of the standard of review and the modality of exclusion being applied, *Garrity,* at best, wanders in its focus and, arguably, does not even focus on such questions at all.

The *Garrity* decision was a five-to-four split decision. The seven-page opinion of Justice Douglas for the five-justice majority was in many ways cursory in its analysis. Although *Garrity* was decided three years after *Malloy v. Hogan* made the Fifth Amendment privilege applicable to the states, Justice Douglas's opinion still sounds in the language of general Fourteenth Amendment voluntariness. (No dates are given for the interrogations in issue and there is no consideration of whether the analysis is properly to be made under the general due process clause of the Fourteenth Amendment or under the Fifth Amendment privilege.) In the more carefully analyzed dissent of Justice Harlan, by contrast, the majority opinion is criticized as "stem[ming] from fundamental misconceptions about the logic and necessities of the constitutional privilege against self-incrimination." 385 U.S. at 500–01, 87 S.Ct. at 620. The difference is not critical, however, because both Fourteenth Amendment involuntariness and Fifth Amendment compulsion would be subjected to the same "totality of circumstances" mode of analysis. It does illustrate, however, the arguably "slap-dash" treatment of the issues, other than the bottom-line result, in the majority opinion.

Confining ourselves to the majority opinion alone, some of its language does, to be sure, lend itself to the interpretation that it is announcing a rule of *per se* exclusion. Other

language, by way of sharp contrast, very definitely describes the issue before the Court as that of whether the statements in question were "voluntary":

> We agree with the New Jersey Supreme Court that the forfeiture-of-office statute is relevant here only for the bearing it has on *the voluntary character of the statements* used to convict petitioners in their criminal prosecutions.

385 U.S. at 496, 87 S.Ct. at 618 (Emphasis supplied).

The majority opinion then spoke of the "coercion that vitiates a confession under" five Supreme Court cases, all of which employed the "totality of circumstances" approach: *Chambers v. Florida*, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); *Lisenba v. California*, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941); *Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) ("Thus the range of inquiry in this type of case must be brought, and this Court has insisted that the judgment in each instance be based upon consideration of, '[t]he totality of the circumstances.'" 361 U.S. at 206, 80 S.Ct. at 280); *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) ("Haynes' undisputed testimony as to the making and signing of the challenged confession used against him at trial permits no doubt that it was obtained under a totality of circumstances evidencing an involuntary written admission of guilt." 373 U.S. at 514, 83 S.Ct. at 1343). After discussing these various "totality of circumstances" decisions, the *Garrity* majority moved on to conclude, "We think the statements were infected by the coercion inherent in this scheme of questioning and *cannot be sustained as voluntary under our prior decisions*." 385 U.S. at 497–98, 87 S.Ct. at 619 (Emphasis supplied). That is not a predicate from which a conclusion of *per se* exclusion follows.

In his dissent, Justice Harlan takes the majority opinion sternly to task for its lack of procedural focus. He argues that, quite aside from the question of whether the resulting decision is correct, the analytical approach is undisciplined:

The majority employs a curious mixture of doctrines to invalidate these convictions, and I confess to difficulty in perceiving the intended relationships among the various segments of its opinion.... 

The majority is apparently engaged in the delicate task of riding two unruly horses at once: it is presumably arguing simultaneously that the statements were involuntary as a matter of fact, in the same fashion that the statements in *Chambers v. Florida* and *Haynes v. Washington,* were thought to be involuntary, and that the statements were inadmissible as a matter of law, on the premise that they were products of an impermissible conditions imposed on the constitutional privilege.

385 U.S. at 501, 87 S.Ct. at 621 (Citations omitted). The dissent, unsure of which analysis it had to refute, proceeded to dissent from the majority opinion in two alternative ways.

To be charitable, it would have been unrealistic to have expected too much clear direction from the *Garrity* opinion. It was written a bare seven months after *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), made it clear that challenged confessions in state criminal trials would be assessed pursuant to the Fifth Amendment's privilege against compelled self-incrimination. (*Malloy v. Hogan* had merely alluded in that direction two years earlier). As an almost universal appellate phenomenon, it is extremely rare for a first-generation opinion to anticipate many of the nuances and subtleties that will only later emerge into view. More sophisticated analysis almost always must await the second or third examination that a court undertakes of a complicated problem. The law needs to work with a principle for a time before the necessity for finer calibration even becomes evident.

The *Garrity* majority was concerned with a "bottom-line" result. The issue before it did not depend on the standard of appellate review or on the modality of exclusion to be applied and the Court did not advertently make any decision in those regards. We should not, therefore, attempt to read more into

its decisional technique than it itself was aware of. Would, for instance, the Supreme Court have called for the *per se* exclusion of a confession following a threatened job loss even if the evidence had revealed that the threatened officer had already accepted a better paying job and had actually posted a letter of resignation the evening before the toothless threat was made? Almost certainly not, but the answer is purely speculative because no such question was remotely before the Court. We cannot know what the Supreme Court would have done because the Supreme Court itself does not know what it would have done. The question never arose.

What we do know from almost thirty years of the law's growth since *Garrity* is that the issue of compulsion (call it, if you choose, involuntariness) under the Fifth Amendment privilege is resolved by looking at the totality of the circumstances from the subjective prospective of the defendant. If a true *Garrity*-like fact pattern were before the Supreme Court today, the Court would probably reach the same end result. Current analysis, however, would begin with the Court's recognition of its prerogative to make an independent, reflective, *de novo* determination as to the conclusory, constitutional fact of a confession's voluntariness. *Thompson v. Keohane*, 516 U.S. ——, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). *Cf. Ornelas v. United States*, 517 U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). The Court might well, as part of its *de novo* determination, give dispositive weight to the threat of an occupational sanction. It would, however, be an *ad hoc* determination and not an occasion for *per se* exclusion. The Court today, of course, has available to it analytic tools that simply had not yet been developed when *Garrity* was decided.

In *Reynolds v. State*, 327 Md. 494, 610 A.2d 782 (1992), the Court of Appeals recognized that when a confession is constitutionally challenged as being compelled or involuntary, the required analysis will look at the totality of the circumstances. Speaking for the Court, Judge Chasanow observed, 327 Md. at 503–04, 610 A.2d 782:

When analyzing whether a confession was voluntary under due process standards, "[t]he test is of the totality of the

circumstances. All of the circumstances of the interrogation, and the particular characteristics of the accused must be examined. Generally, no one factor is dispositive." D. Nissan, et al., *Law of Confessions* § 1:9 (1980, 1991 Cum. Supp.) (hereinafter *Law of Confessions* ). "[W]hether [a] confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances." *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 521 (1963).

*Reynolds* went on to note that even when examining a challenged confession under state non-constitutional law, not here pertinent, Maryland generally follows the federal approach of looking at the totality of the circumstances:

> In harmony with the approach taken in federal constitutional analysis, Maryland has for the most part applied a "totality of the circumstances" rule when appraising the voluntariness of confessions under state nonconstitutional law.

327 Md. at 504, 610 A.2d 782. After pointing out that Maryland may continue to use a *per se* approach in one aberrational little pocket dealing with the impact of promises (though not necessarily of threats) under Maryland common law, Judge Chasanow pointed out that the decided trend is nonetheless away from *per se* exclusion:

> In the 1991 supplement to their work, . . . [D. Nissan, et. al, *Law of Confessions* ] note that there is "a pronounced trend away from" per se exclusion and "toward a totality of the circumstances approach." *Id.* § 1:12, at 13 (1991 Cum. Supp.). McCormick also notes that judicial rejection of the per se analysis in favor of a totality of the circumstances approach has increased the need for determining the impact of promises on particular defendants in particular interrogations. 1 *McCormick* § 154, at 615.

As an alternative reason why the appellant's statement in this case should not have been excluded under the ostensible authority of *Garrity v. New Jersey* but primarily as

guidance for the future, we assert that with respect to a challenged confession under the Fifth Amendment privilege, *per se* exclusion is never automatically called for and that *Garrity* (and *Holloway*) are not viable authority for any proposition to the contrary.

### 3. There Was No Causal Connection

The appellant is thrice bereft. Even if 1) this case were factually apposite to *Garrity v. New Jersey* and 2) *Garrity v. New Jersey* were valid authority for *per se* exclusion (neither assumption is true), there would still have been an utter failure by the appellant to show any cause-and-effect relationship between the interrogator's behavior and the appellant's statement. The absolute indispensability of a causal connection was thoroughly analyzed by *Reynolds v. State,* 327 Md. at 509, 610 A.2d 782:

> One common thread that runs through our cases is that the promise must have caused the suspect to confess. If a suspect did not rely on an interrogator's comments, obviously, the statement is admissible regardless of whether the interrogator had articulated an improper inducement. By definition, there would have been no "inducement" at all, because the interrogator "induced" nothing. See *Ralph v. State* in which we said, "[T]he court besides finding out whether an inducement held out to the accused should also ascertain whether he had been influenced by such inducement in making the confession." We noted that there was nothing in that case "to show what *effect* the statement had on the defendant." 226 Md. at 486–87, 174 A.2d at 166. *See also State ex rel. Collins v. Superior Court,* 145 Ariz. 493, 702 P.2d 1338, 1340 (1985) ("[T]he promise must *induce* the defendant to waive his fifth amendment rights. If defendant did not rely on the promise, he certainly was not induced by it to make a statement.")

(Emphasis in original).[5]

Even when dealing with the impact of a promise or inducement under Maryland's common law, the presence of a cause-and-effect requirement so dominates the analysis that the difference between a "totality of circumstances" approach and a *per se* exclusion approach is reduced to something so minimal as to be virtually nugatory. If the inducement is shown to have had *some*, even if only slight, influence on a subsequent confession, the *per se* exclusion approach creates a conclusive presumption that the influence was dispositively catalytic and relieves the defendant of the burden of showing that his will was in fact overborne by such an influence. If the inducement is found to have had *no* influence on the resulting confession, however, the defendant is out of luck under either approach.

In this case, there was no cause-and-effect relationship. In the first place, the appellant was not confronted by any threat. The appellant was a seventeen-year veteran of the police force who by his own admissions knew the intricacies of the LEO-BOR. As the trial court found, he was well aware that he was under no obligation to answer any questions. The appellant, based on his extensive experience with the LEOBOR, knew the importance of not having been *ordered* to give a statement. Judge Dudley's fact finding was very specific with respect to the appellant's mastery of the provisions of the Law Enforcement Officers' Bill of Rights and of their implications:

> There was no person in this courtroom more familiar with the Law Enforcement Officer's Bill of Rights than Sgt.

---

**5.** Federal courts have generally agreed with the requirement of a cause-and-effect relationship even under *Garrity*. *See, e.g., U.S. v. Friedrick*, 842 F.2d 382, 395 (D.C.Cir.1988) (noting that under *Garrity*, the police officer must have in fact believed that he was compelled to give a statement or lose his job, and that belief must have been objectively reasonable based on the governments actions). Indeed, mere existence of a policy, for example, that the police officer had no knowledge of, could not be the actual cause of a police officer's decision to speak. *See, e.g., U.S. v. Camacho*, 739 F.Supp. 1504, 1515–17 (S.D.Fla.1990) (pointing out that the police officers were aware of the policy that threatened their jobs, and that under the totality of the circumstances, the statements were the product of coercion).

Martin. He had used it. He was completely familiar with it. And so Lt. Schlossnagle did not inform him of any matter or not inform him of any matter which either presented an issue or [represented] an issue that Sgt. Martin was not already familiar with.

Judge Dudley explicitly found, moreover, that nothing done by the interrogating superior officer *caused* the appellant to do anything. As he explained:

The Court finds as a matter of fact that Officer Martin did not make a statement to Lt. Schlossnagle as a result of his concern over the consequences of his failure to respond. This Court finds as a fact that he did not give a statement because he felt compelled to do so as a result of the provisions of the Law Enforcement Officer's Bill of Rights. And under those circumstances, the Court finding that the statement made was freely and voluntarily made in all respects and under all the circumstances, the motion to suppress the statement is denied.

We hold that the appellant's statement was properly received in evidence.

### The Warrantless Search of the Police Vehicle

The appellant next contends that Judge Dudley erred in refusing to suppress evidence seized during the Howard County Police Department's warrantless search of his police vehicle. It was a vehicle that the appellant was authorized to use for on-duty and off-duty purposes. The search of the vehicle revealed a mini-flashlight. The flashlight was later determined to contain DNA from two different persons. The evidence thus tended to corroborate M.N.'s testimony that the appellant inserted the flashlight into her vagina and then into his own mouth.

We affirm Judge Dudley's ruling that "[t]here is no fact or combination of facts that under the circumstances presented in this case would lead one to reasonably believe there was a reasonable or a justifiable expectation of privacy in this vehicle." To say that the appellant lacked a reasonable expecta-

tion of privacy is simply another way of saying that the appellant possessed no Fourth Amendment interest, which is to say that he was not an aggrieved person with standing to litigate the alleged violation of a Fourth Amendment protection he did not enjoy.

The short way to affirm Judge Dudley's ruling is simply to rely on *Gamble v. State,* 78 Md.App. 112, 552 A.2d 928, *aff'd on other grounds,* 318 Md. 120, 567 A.2d 95 (1989). In *Gamble,* police superiors warrantlessly searched a police cruiser that had been made available to the defendant police officer for his personal as well as his official use. This Court held, speaking through Chief Judge Gilbert, 78 Md.App. at 116, 552 A.2d 928:

> The police needed no warrant to search Gamble's cruiser since it was police property, and no warrant is required to search one's own property. The policy that allowed officers to use cruisers for personal purposes clearly made the vehicles subject to police inspection, at any time, without the user's permission.

(Citation omitted).

Even if *Gamble v. State* were not available to us as a doctrinal short-cut, however, we would still reach the same result by applying the "reasonable expectation of privacy" test set forth in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). As part of *Katz*'s totality of the circumstances, there were, to be sure, several factors that would point toward the appellant's possession of a reasonable expectation of privacy. He was in December, 1994 given use of a police vehicle as part of the Patrol Vehicle Saturation Program. That program provided that police officers residing in Howard County might be issued police vehicles for both on-duty and off-duty purposes. The appellant was allowed to keep the vehicle at home and to keep personal effects in the vehicle. Those were factors that would tilt toward a finding that the appellant enjoyed a reasonable expectation of privacy in the vehicle that was made available for both his official and his private use.

There were also, by way of contrast, strong countervailing factors that pointed decisively away from the appellant's possession of either a subjectively reasonable or objectively reasonable expectation of privacy in the police cruiser.

Although a police cruiser was made available to Howard County officers so that the police presence might be more widely perceived in the community, there were a number of limitations imposed on an individual officer's use of the vehicle. One of these was that an officer was not permitted to take a vehicle outside of the county without first obtaining official permission from a supervising officer. Another was that even when using the vehicle for a personal or family-related purpose, the officer was required, whenever in the vehicle, to be armed. Also derogating from any notion of unfettered availability for personal use was the requirement that the officer, whenever in the vehicle, be in "proper attire."

*Vis-a-vis* his own police department, moreover, the appellant had no right to exclude his police superiors from entering or examining the cruiser. In the appellant's own testimony at the suppression hearing, he acknowledged that the cruiser was subject to inspection on a scheduled monthly basis. He further acknowledged that the vehicle could be inspected by a supervisor at any time, without any requirement that notice be given him in advance. The multi-purposes of these inspections, moreover, were pervasive. There could be inspections for reasons of routine maintenance. There could be inspections to make certain that the vehicle was fully stocked with necessary equipment and supplies. There could be inspections to insure that proper cleanliness standards were being maintained. These latter two purposes indisputably implied the necessity on the part of the inspector to look into the interior and into the trunk of the vehicle and not simply under the hood.

Of particular pertinence to the issue of the appellant's lack of any subjective reasonable expectation of privacy was his own testimony to the effect that he, in his supervisory capacity as a sergeant, felt that he enjoyed the prerogative of entering

and inspecting the police cruisers entrusted to other members of the department under the same conditions that his vehicle had been entrusted to him. On the issue of any subjective expectation of privacy, that testimony was absolutely dispositive. The appellant could not profess a belief in any immunity *vis-a-vis* his own superiors that he did not believe his subordinates possessed *vis-a-vis* him.

In further derogation of any belief that the appellant enjoyed exclusive control over his vehicle was the fact that it could be consigned to the maintenance shop without his exercising any discretion or control. The appellant himself testified that when mechanics worked on police vehicles, they were free to use them for errands even in the course of test-driving them. When the appellant's cruiser would be in the shop or otherwise commandeered, the appellant might be assigned another vehicle. Just as some other officer was thereby denied the exclusive use of his vehicle *vis-a-vis* the appellant, the appellant was denied exclusive use *vis-a-vis* others.

The appellant further testified that all of the vehicles of a particular model used by the department could be operated by a single common key, a key that could be used both to open the doors and the trunk and also to turn on the ignition. In the appellant's estimation, there were approximately forty or fifty vehicles similar to his own with any of forty or fifty officers, therefore, able to operate any of those vehicles. If an officer needed a vehicle on an emergency basis and his own were not available, he would be readily able to commandeer a similar vehicle without a change of key. If any officer were in emergency need of firearms, first aid supplies, road flares, or any other equipment, he would be readily able to commandeer such supplies from another officer's vehicle.

Lieutenant Schlossnagle also very explicitly pointed out that a Howard County Police Department general order provides that the inspection of departmental vehicles involves far more than maintenance and includes looking for the presence of drugs or other contraband:

We have a general order that covers that. Generally you're looking for police equipment that is stocked, supplied properly; that there's sufficient oil and air and things of that nature in the vehicle; maintenance records; that no contraband has been stuffed in the back seat, such as hypodermic syringes or drugs by defendants. *It's a general search of the vehicle* ... (Emphasis supplied).

Under redirect examination, he was asked and answered:

Q: Likewise, during a search of one, or an inspection as defense counsel has questioned you about, a regular inspection, if you saw any evidence that you believed was evidence of criminal activity, would you ignore it?

A: No, certainly not.

Q: And what if any information or training is an officer given in regards to that?

A: Any, any items that are illegal or contraband or may have been involved in a criminal matter then would be seized and an investigation conducted.

From this overwhelming evidence of the interchangeability of both vehicles and police equipment and supplies carried in vehicles and of the sweeping nature of the permitted inspections, we are persuaded, by way of our own *de novo* review, just as Judge Dudley was persuaded, that the appellant enjoyed no reasonable expectation of privacy, either subjectively or objectively, in the police cruiser that had been assigned to him.

When the appellant's police superiors entered, as they had a right to do, the appellant's cruiser, the flashlight that was ultimately introduced into evidence was a piece of departmentally-issued equipment that was sitting in the open on the front seat console of the vehicle. There was no intrusion into any briefcase, box, or other closed container, arguably used by the appellant for the storage of his own personal effects.

We hold that the appellant was not entitled to challenge the search of the police cruiser that produced the flashlight.

### *Sufficiency of the Evidence of Constructive Force*

The appellant's third contention, as expressly framed by him, is simply the undifferentiated claim that "the court erred in finding the evidence sufficient to sustain *a* conviction." *A* conviction? The appellant, of course, suffered four convictions, not one. They were:

1) A second-degree sexual offense;
2) A third-degree sexual offense;
3) A fourth-degree sexual offense; and
4) A battery.

The actual argument made by the appellant in support of the contention, however, goes only to the required element that the criminal act be engaged in "by force or threat of force." Of the appellant's four convictions, the only one that directly requires proof of such an element is that for the second-degree sexual offense. In arguing legal sufficiency in his brief, the appellant refers to no other conviction than that for the second-degree sexual offense.

Assuming the satisfactory establishment of the *corpus delicti* of any or all of the crimes for which the appellant was convicted, the appellant mounts no argument, nor plausibly could he, with respect to his criminal agency. The narrow focus of the contention on the element of "force or threat of force" necessarily means, moreover, that no challenge is being made to the sufficiency of the evidence to support the convictions for the fourth-degree sexual offense and for the battery, two crimes that do not include "force or threat of force" as a required element, either expressly or implicitly. Except obliquely, neither does the appellant challenge his conviction for a third-degree sexual offense, a crime which does not directly mention "force or threat of force" as a formal statutory element.

### *a. Second–Degree and Third–Degree Sexual Offenses Compared*

In terms of their respective *corpora delicti* and in the factual context of this case, the primary difference be-

tween a second-degree and a third-degree sexual offense is that the second-degree crime deals with engaging in "a sexual *act*" whereas a third-degree crime deals with engaging in "sexual *contact*." The insertion of a flashlight into the victim's vulva and/or vagina was legally sufficient evidence of a "sexual act." Md.Ann.Code, art 27, § 461(e) (1996) provides, in pertinent part:

> *Sexual act* also *means the penetration,* however slight, *by any object into the genital* ... *opening of another person's body* if the penetration can be reasonably construed as being for the purposes of sexual arousal or gratification or for abuse of either party and if the penetration is not for accepted medical purposes. (Emphasis supplied).

The victim's testimony that the appellant also caressed her genital area with his hands and fingers was legally sufficient evidence of "sexual contact." Section 461(f) provides, in pertinent part:

> *"Sexual contact"* as used in §§ 464B and 464C, *means the intentional touching* of any part of *the victim's* ... *genital areas* ... for the purposes of sexual arousal or gratification or for abuse of either party and includes *the penetration,* however slight, *by any part of a person's body,* other than the penis, mouth, or tongue, *into the genital* ... *opening of another person's body* if that penetration can be reasonably construed as being for the purposes of sexual arousal or gratification or for abuse of either party. (Emphasis supplied).

Another difference between a second-degree and a third-degree sexual offense is in their respective modalities of intimidation. Although a third-degree sexual offense requires less than does the second-degree offense in terms of the atrocity of the sexual invasion of the victim's body, it in some ways requires more by way of the violence or threat of violence employed to overcome the victim's will to resist. "Force or threat of force" is an express element only of the second-degree sexual offense. Section 464A(a) provides, in pertinent part:

A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person:

(1) By force or threat of force against the will and without the consent of the other person ...

A third-degree sexual offense, by contrast, does not expressly require, as does the second-degree offense, that the prohibited conduct be engaged in "by force or threat of force." It does, however, require, as the second-degree offense does not, the presence of at least one of four disjunctive elements, three of which involve extreme physical injury or threat thereof. Section 464B(a), defining a third-degree sexual offense, provides:

A person is guilty of a sexual offense in the third degree if the person engages in:

(1) Sexual contact with another person against the will and without the consent of the other person, and:

(i) Employs or displays a dangerous or deadly weapon or an article which the other person reasonably concludes is a dangerous or deadly weapon; or

(ii) Inflicts suffocation, strangulation, disfigurement or serious physical injury upon the other person or upon anyone else in the course of committing that offense; or

(iii) Threatens or places the victim in fear that the victim or any person known to the victim will be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping; or

(iv) Commits the offense aided and abetted by one or more other persons ...

Those four alternative elements are, *verbatim*, four of the five aggravating circumstances that will raise a second-degree sexual offense or second-degree rape (both involving mere "force or threat of force") to the level of a first-degree sexual offense or rape. The two first-degree offenses require 1) "force or threat of force" as a minimal predicate and then require, on top of that, 2) one of five disjunctive aggravating circumstances. A third-degree sexual offense, by contrast with a first-degree sexual offense or rape, makes no mention

of the minimal predicate of "force or threat of force" and jumps immediately to the requirement of one of four alternative intimidating factors.

From that smorgasbord of four alternative aggravating factors, the conviction for the third-degree sexual offense in this case was presumably based on a finding that the appellant "engage[d] in sexual contact" with M.N. by fondling her genital area after having "place[d][her] in fear that [she] [would] be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping." Indeed, M.N. testified that the confluence of circumstances had placed her in fear that she might be killed by the appellant if she offered resistance or otherwise angered him. In terms of legal sufficiency, moreover, the evidence could have alternatively supported a reasonable inference that M.N. feared being kidnapped (or feared the prolongation of a kidnapping already in progress).

The appellant, however, raises no express challenge with respect to the evidentiary support for any of those statutory elements of a third-degree sexual offense nor even refers to the third-degree conviction by name. Some, but not all, of these alternative elements of a third-degree sexual offense may coincidentally be instances of the "force or threat of force" required for a second-degree sexual offense. The fear of kidnapping, however, may or may not be such an instance. The proof of at least one item from this "laundry list" of alternative aggravations required for a third-degree sexual offense and the proof of "force or threat of force" required for a second-degree sexual offense are obviously not simply two ways of saying the same thing or a conviction for a first-degree sexual offense would not insist upon the proof of both of them.

The appellant may be hoping that were he to prevail in his attack on his conviction for the second-degree sexual offense, there would be some sort of necessary and inferential spillover effect on his conviction for the third-degree sexual offense. He articulates nothing in that regard, however, and it

is not for us to raise or to create arguments on his behalf. We are dissecting and comparing the second-degree sexual offense and the third-degree sexual offense in this detail because we are disinclined to treat a challenge to the legal sufficiency of the evidence to support the third-degree conviction as something that has been raised by necessary implication or *sub silentio.*

### b. *Lack of Consent and Constructive Force Distinguished*

We will confine ourselves, therefore, to an examination of the legal sufficiency of the evidence to support the conviction for the second-degree sexual offense. The element in issue is "force or threat of force." That obviously means more than the mere physical exertion required to engage in a sexual act "against the will and without the consent of the other person." Lack of consent, on the one hand, and force or threat of force, on the other hand, are distinct elements. A comparison of the four degrees of sexual offense makes that distinction clear. Each of the four degrees of a sexual offense expressly requires that the prohibited sexual act or sexual contact be "against the will and without the consent of the other person." That common denominator element is all by way of intimidation that a fourth-degree sexual offense requires. The fourth-degree offense is only a misdemeanor with a maximum penalty of one year's incarceration.

It is only when additional elements of intimidation, beyond mere non-consent, are added to the definition that the severity of the sexual offenses escalates dramatically. A third-degree sexual offense involves the same *non-consensual sexual contact* as does the fourth-degree offense. The presence of one of the four aggravating factors, however, raises the status of the crime to the felony level and the maximum term of imprisonment from one year to ten. For prohibited *sexual acts,* the second-degree sexual offense requires force or threat of force in addition to the absence of consent. A first-degree sexual offense requires both 1) force or threat of force and 2) one of the aggravating factors as elements above and beyond the mere absence of consent. In *Goldberg v. State,* 41 Md.App.

58, 69, 395 A.2d 1213 (1979), this Court clearly distinguished the "force or threat of force" element and the "absence of consent" element in the context of a rape case:

> Without proof of force, actual or constructive, evidenced by words or conduct of the defendant or those acting in consort with him, sexual intercourse is not rape. *This is so even though the intercourse may have occurred without the actual consent and against the actual will of the alleged victim.*

(Footnote omitted; emphasis supplied).

As we undertake our examination of the element of "force or threat of force," we studiously will attempt to avoid the confusion and, indeed, conflation of two elements that much of the case law has carelessly perpetrated. In his dissenting opinion for this Court in *Rusk v. State,* 43 Md.App. 476, 406 A.2d 624 (1979), a dissent that was subsequently validated by the Court of Appeals in *State v. Rusk,* 289 Md. 230, 424 A.2d 720 (1981), Judge Wilner kept the distinction clear:

> [A] person is guilty of rape in the second degree if he (1) engages in vaginal intercourse with another person, (2) by force or threat of force, (3) against the will, and (4) without the consent of the other person. There is no real question here as to the first, third, or fourth elements of the crime. The evidence was certainly sufficient to show that appellant had vaginal intercourse with the victim, and that such act was against her will and without her consent. *The point at issue is whether it was accomplished by force or threat of force.... Consent is not the issue here, only whether there was sufficient evidence of force or the threat of force.*
>
> Unfortunately, *courts,* including in the present case a majority of this one, often *tend to confuse these two elements—force and lack of consent—and to think of them as one. They are not. They mean, and require, different things.*

43 Md.App. at 485, 406 A.2d 624. (Emphasis in original and emphasis supplied). Judge Wilner identified the obvious source of the confusion. A victim's lack of resistance may

serve, merely as an item of evidence, to negate either or both of the two elements. The fact that the same evidence may be relevant to the proof or disproof of two separate elements, however, does not conflate two elements into one. Judge Wilner explained the confusion:

What seems to cause the confusion—what, indeed, has become a common denominator of both elements—is the notion that the victim must actively resist the attack upon her. *If she fails to offer sufficient resistance* (sufficient to the satisfaction of the judge), *a court is entitled,* or at least presumes the entitlement, *to find* that there was no force or threat of force, *or* that the act was not against her will, *or* that she actually consented to it, *or* some unarticulated combination or synthesis of these elements that leads to the ultimate conclusion that the victim was not raped.

43 Md.App. at 486, 406 A.2d 624 (Emphasis supplied).

In *State v. Rusk,* Chief Judge Murphy highlighted the theretofore largely neglected distinction. He characterized *Hazel v. State,* 221 Md. 464, 157 A.2d 922 (1960) as having "recognized that force and lack of consent are distinct elements of the crime of rape," arguably giving *Hazel* more credit than it was due. 289 Md. at 242, 424 A.2d 720. He went on to note the nuanced difference in the elements notwithstanding the evidentiary overlap in their proofs:

*Hazel* thus made it clear that lack of consent could be established through proof that the victim submitted as a result of fear of imminent death or serious bodily harm. In addition, if the actions and conduct of the defendant were reasonably calculated to induce this fear in the victim's mind, then the element of force is present. *Hazel* recognized, therefore, that *the same kind of evidence may be used in establishing both force and nonconsent,* particularly when a threat rather than actual force is involved.

289 Md. at 243, 424 A.2d 720 (Emphasis supplied). *See also Kackley v. State,* 63 Md.App. 532, 542, 493 A.2d 364 (1985) ("We glean from the cases that the victim's fear must not only be genuine, but it must also be reasonable.")

In this case, the evidence was uncontradicted that M.N. did not consent to the sexual act or the sexual contact. She was the only trial witness who was at the crime scene and she testified that she did not consent. She testified, moreover, that she submitted, feigning sleep, rather than actively resisted because of her fear of death or bodily harm. The appellant, the only other person present during the commission of the crime, did not testify at trial. Even his statement to the police did not allege consent on the part of M.N. In his statement, the appellant denied that there had been any sexual activity at all. Thus there was no evidence of consent whatsoever. Lack of consent is not an issue in this case. That, however, is not all that the State must prove to obtain a conviction for a second-degree sexual offense.

M.N.'s decision to submit because of a genuine fear of death or bodily harm *ipso facto* negates any idea of consent, regardless of whether such fear was reasonable or not. The reasonableness of such fear, as contrasted with the genuineness of the fear, goes to the constructive force element, not to the lack of consent element. Whether the circumstances in which the appellant placed M.N. were sufficiently threatening to make her fear and her resulting decision not to resist reasonable is the key factor in determining whether the appellant was guilty of using constructive force.

### c. Constructive Force

Focusing in now on the "force or threat of force" element, a defendant must either 1) exert enough physical force to overcome any resistance that is offered or 2) generate enough of a threat of force to make a victim's decision not to resist reasonable. Such a threat of force is referred to as constructive force. The appellant and the State are in agreement that there was no *actual* force used in committing these sexual acts and that M.N. offered no actual physical resistance to the appellant's sexual actions. The only question is whether the evidence supported a finding of *constructive* force. *Hazel v. State*, 221 Md. at 469, 157 A.2d 922, described such constructive force:

If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim—having regard to the circumstances in which she was placed—a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force.

*Hazel* went on, 221 Md. at 470, 157 A.2d 922, to describe the types of dire consequences that a victim must fear to obviate the need to resist:

The kind of fear which would render resistance by a woman unnecessary to support a conviction of rape [or of a sexual offense] includes, but is not necessarily limited to, a fear of death or serious bodily harm, or a fear so extreme as to preclude resistance, or a fear which would well nigh render her mind incapable of continuing to resist, or a fear that so overpowers her that she does not dare resist.

*Goldberg v. State,* 41 Md.App. at 68, 395 A.2d 1213, phrased the question as that of "whether the prosecutrix's lack of resistance was caused by fear based upon reasonable apprehension of physical harm."

In *State v. Rusk,* Chief Judge Murphy made another theretofore neglected distinction and pointed out that *Hazel* had not had the occasion to deal with whether *a victim's subjective perception of a threat must be reasonable* but only with whether the defendant's making of the threat was "reasonably" calculated to overcome the victim's will to resist. *State v. Rusk* went on as a matter of first impression, however, to adopt the majority rule that the victim's fear and decision to submit must, indeed, also be reasonable in order to permit the State to rely on constructive force rather than be required to prove actual force:

*Hazel did not expressly determine whether the victim's fear must be "reasonable."* Its only reference to reasonableness related to whether "the acts and threats of the defendant were reasonably calculated to create in the mind of the victim ... a real apprehension, due to fear, of imminent bodily harm...." Manifestly, *the Court was*

*there referring to the calculations of the accused, not to the fear of the victim.* While *Hazel* made it clear that the victim's fear had to be genuine, it did not pass upon whether a real but unreasonable fear of imminent death or serious bodily harm would suffice. The vast majority of jurisdictions have required that *the victim's fear be reasonably grounded in order to obviate the need for either proof of actual force on the part of the assailant or physical resistance on the part of the victim.* We think that, generally, this is the correct standard.

289 Md. at 243–44, 424 A.2d 720 (Citation and footnote omitted; emphasis supplied).

*State v. Rusk,* 289 Md. at 244, 424 A.2d 720, stated that a finding of constructive force is contingent on "a showing of a reasonable apprehension of fear ... to establish the elements of the offense where the victim did not resist." The appellant's argument is that his actions were not enough to create in the victim "a reasonable apprehension of fear." The essence of his argument is that while he was performing the sexual acts on M.N., she remained completely silent and motionless in an effort to feign sleep, and never offered any resistance to the appellant's advances even though she had stated she was physically able to offer resistance. Moreover, the appellant points out that evidence at trial showed he did not threaten to arrest her or force her into the police car, and he never displayed a weapon or referred to his gun. Thus, according to the appellant, M.N.'s professed fear was unreasonable and there was a complete absence of constructive force.

To constitute a rape or a sexual offense, however, the conduct need not always be so blatantly "forceful." Rather, the perpetrator's creation of certain conditions may, depending on the circumstances, obviate the need for such outward expressions of force. *See Rusk,* 289 Md. at 232–36, 424 A.2d 720 (perpetrator took victim's car keys, leaving her stranded in an unknown area; grabbed her wrists and pulled her to the bed; "lightly" choked her; looked at the victim in a threatening manner); *Blotkamp v. State,* 45 Md.App. 64, 65, 411 A.2d

1068 (1980) (perpetrator demanded money, blocked the only exit available to the victim, told the victim to remove her clothes, and claimed to have a knife).

 The law is clear that "no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend upon the prevailing circumstances." *Hazel,* 221 Md. at 469, 157 A.2d 922. In light of the myriad of circumstances that can arise, the reasonableness of a victim's nonresistance is usually best left to the fact finder. *See Rusk,* 289 Md. at 245, 424 A.2d 720. Accordingly, the trial court's rationale for finding the appellant guilty of committing a second-degree sexual offense is vital because, in reviewing a claim that the evidence was insufficient to support a conviction, "we review the evidence in the light most favorable to the State . . . giving due regard to the trial court's findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of the witnesses." *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994) (citations omitted). We may not reverse the finding of the trial court unless the decision of the trial court is clearly erroneous. *Wiggins v. State,* 324 Md. 551, 567, 597 A.2d 1359 (1991).

Judge Dudley articulated in detail his reasoning for finding that the constructive force requirement for a second-degree sexual offense had been satisfied. The crux of his analysis was:

> Now, the resolution of these weight and credibility issues is that the Court is satisfied and finds as a fact, beyond a reasonable doubt, that the sexual offenses alleged did in fact occur. And the question is whether or not the person who [was] put in those circumstances, that is, the totality of the circumstances, is required to do more than nothing. Now, up to that point in time, of course, Sgt. Martin had put himself in that position. He had picked up a member of the opposite sex, always a dangerous thing to do. Two, he picked up a person who he said was obviously under the influence of alcohol. Three, he said at the beginning of

calling in and going to the Burtonsville Shopping Center, transfer her custody to the Montgomery County Police or somebody else. None of that, of course, was done. He called in to report that he'd discharged his female passenger, which of course was a lie. She remained in his car for another two hours without any explanation. He indicated he was in the middle of the shopping center. She testified she couldn't see any lights at all. All she could see was darkness, trees and no people. *So the Court finds that at the time of these sexual activities, that the witness was put in a position of seclusion where she saw no lights, saw no other people, saw no place to [go], and saw no other person available for help.* Now in this case, *Sgt. Martin was in position of total dominion and control over the victim. She testified that this put her in fear and such fear that she actually froze, panicked and could not move. The Court finds that under these circumstances this fear to be genuine and under these circumstances this fear and this response to be reasonable. Court finds that in 1995, it is not necessary for a victim to attempt to run away from the police.* (Emphasis supplied).

As *Kackley v. State,* 63 Md.App. 532, 542, 493 A.2d 364 (1985), observed, "[T]he question of the reasonableness of a victim's fear or apprehension is a question of fact for the jury [or judge sitting as a jury]." It is the teaching of *State v. Rusk,* 289 Md. at 245–46, 424 A.2d 720, moreover, that it is "for the [fact finder] to observe the witnesses and their demeanor, and to judge their credibility and weigh their testimony." In overturning the *en banc* decision of this Court in *Rusk v. State* that the evidence was not legally sufficient to establish that the victim's fear was reasonable, the Court of Appeals stated emphatically:

We think the reversal of Rusk's conviction by the Court of Special Appeals was in error for the fundamental reason so well expressed in the dissenting opinion by Judge Wilner when he observed that *the majority had "trampled upon the first principle of appellate restraint . . . [because it had] substituted [its] own view of the evidence (and the infer-*

*ences that may fairly be drawn from it) for that of the judge and jury ... [and had thereby] improperly invaded the province allotted to those tribunals."* In view of the evidence adduced at the trial, the reasonableness of Pat's apprehension of fear was plainly a question of fact for the jury to determine.

289 Md. at 245, 424 A.2d 720 (Citation omitted; emphasis supplied).

Although there were no overt verbal or physical threats made in this case (after all, the victim appeared to be asleep), there were other circumstances created by the appellant that had the potential to be very intimidating. His status as a uniformed and armed police officer was a very important factor that weighs heavily in favor of finding that M.N.'s fear was reasonably grounded. As *Walter v. State*, 9 Md.App. 385, 392, 264 A.2d 882 (1970), observed in this regard:

> Although a police officer does not stand *in loco parentis* to a person he has taken into his car, or even taken into custody, there is some analogy between the cases involving parents and those involving policemen since both the parent and the policeman are figures of authority; therefore, the force and resistance required under these exceptional circumstances is not great.

M.N. had accepted the ride on the assumption that she was going to be driven home. After accepting the ride, she awoke to find herself in an unfamiliar and isolated "dark area," and there were no people in sight. The appellant, an armed police officer, then began to engage in unsolicited and "extreme" sexual conduct without her permission, including the placing of foreign objects in her vagina. There was no one available to help her, the appellant was "much bigger" than she was, and she was effectively trapped in his police vehicle and there was no place for her to escape. She was, as the appellant was aware, still feeling the effects of her consumption of alcohol earlier in the evening to some degree.

It was just such a set of circumstances that this Court found to be of significance, on the issue of the reasonable apprehen-

sion of fear, in *Blotkamp v. State,* 45 Md.App. 64, 71, 411 A.2d 1068 (1980):

> Susan had no opportunity to escape or to seek assistance. She was alone in the shop when the rape occurred . . . At the critical time, Susan was absolutely helpless—entirely at appellant's mercy.
>
> Under this frightening circumstance, appellant's actions clearly sufficed to establish the necessary threat; they were, in the words of *Hazel,* "reasonably calculated to create in [Susan's] mind—having regard to the circumstances in which she was placed—a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist."

We hold that Judge Dudley was not clearly erroneous in finding that M.N. had been placed by the appellant in circumstances where she had a reasonable fear of death or serious bodily harm. The creation of that set of circumstances constituted constructive force and rendered the appellant guilty of a sexual offense in the second degree.

Likewise, we hold that trial court was not clearly erroneous in finding that the appellant reasonably intended to create the circumstances that produced M.N.'s reasonable fear of physical harm. The trial court was certainly entitled to conclude that the appellant knew that his status as a police officer, the secluded location to which he drove, and the nature of the sexual acts he performed, his physical appearance, and her questionable sobriety would have the effect of eliminating any resistance to his efforts by M.N. This evidence could reasonably support the conclusion that the appellant "deliberately placed the victim in a situation where she would be afraid, with the expectation she would thereby yield to his lustful demands without physical resistance." *Walter,* 9 Md.App. at 395, 264 A.2d 882.

### The Question of Venue
### *When the Location of the Crime Scene Is Uncertain*

The appellant next alleges that the trial court erred by convicting him based on jurisdiction conferred under Arti-

cle 27, § 590 of the Annotated Code of Maryland. That section provides:

> Any person who may commit any crime, felony or misdemeanor, on or at the boundary or divisional line between any of the counties in this State, or so near thereto or where the exact location of such boundary is so uncertain as to render it doubtful in which county the offense was committed, then the county which first assumes jurisdiction by issuing process for the arrest and prosecution of the offender shall have jurisdiction to charge, present, indict, try, convict and sentence; and in such case it shall be only necessary for the State to establish the venue alleged in the information, warrant or indictment, by proving that the offense was at or on the boundary of the county wherein the accused is being tried, or was so near thereto or the location of the boundary is so uncertain as to render it doubtful in which county the crime was committed.

▮▮▮ To begin with, this entire question involves venue and not jurisdiction. *Lett v. State,* 51 Md.App. 668, 675–77, 445 A.2d 1050 (1982). The trial court, in addressing this issue in its decision, stated:

> It's clear that the testimony and evidence never clearly identified where the offense is alleged to—counts one, three, five, six, and seven—were allegedly committed. However, the testimony and evidence does establish that the distance between Little Patuxent and Columbia Road where [M.N.] was picked up and the Howard County line is only several miles. And only several miles beyond that to the Burtonsville Shopping Center. And not many miles past that to her residence. The Court is satisfied that with respect to the jurisdiction/venue question that was posed, that the provisions of Article 27, section 590 adequately cover the situation, are directly applicable in this case; and that it's permissible for the first of either of the two jurisdictions to initiate the prosecution to proceed.

We do not find the trial court's factual conclusion to be clearly erroneous because the exact location of where these

incidents took place was doubtful. It certainly is possible, based on the evidence presented, that the offenses occurred in Howard County, Montgomery County, or in both counties. Accordingly, we fail to find that the trial court committed any error in finding that § 590 applied to this situation, and that the evidentiary requirements were satisfied.

█ It is perhaps gilding the lily to point out that this situation is also covered by Md. Ann.Code, art. 27 § 465, part of the Sexual Offenses subtitle, which provides:

If a person is transported by any means, with the intent to violate this subheading and the intent is followed by actual violation of this subheading, the defendant may be tried in the appropriate court within whose jurisdiction the county lies where the transportation was offered, solicited, begun, continued or ended.

### ... *And Things That Go Bump In The Night*

█ The final contention is the figment of a hyperactive, if not paranoidal, imagination. The appellant conjures up constitutional ogres out of the most innocuous and unoffending of discussions. The appellant claims that the trial court drew an adverse inference against him because of his decision not to testify at trial. The appellant, as support for this contention, points to the following statement made by the trial court when rendering its decision.

And then he had her in the presence of the police car for two more hours. And there is no explanation for where they were, what they were doing, or why.

That is not a comment on the appellant's failure to take the stand. It is not even close. The trial court's reference to the appellant's inability to explain what occurred during those two hours, when read in context of the trial court's entire explanation of its decision, is easily explained as a reference to the appellant's inability to account for his time on the evening in question during his interrogation with Lieutenant Schlossnagle. As we have already found, the statement made by the appellant was properly admitted into evidence, and thus, the

trial court's use of that statement in reaching a decision was proper. *Goines v. State,* 89 Md.App. 104, 113, 597 A.2d 987 (1991) ("[T]he rule does not apply, where, as here, the thrust of the remark is directed toward the lack of evidence rather than pointed directly at the failure of the accused to testify."); *Hutchinson v. State,* 41 Md.App. 569, 572–73, 398 A.2d 451 (1979) ("While it is improper for the State to comment on a defendant's failure to testify, this does not mean that every neutral or indirect reference that the State makes which implicitly refers to a defendant's silence is improper comment."); *Grace v. State,* 6 Md.App. 520, 522, 252 A.2d 297 (1969).

It remains only to be noted that this contention reveals the absurd extremes to which the Fifth Amendment privilege against compelled self-incrimination is sometimes being pushed. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) held simply that neither the judge nor the prosecutor may urge the fact finder to draw an adverse inference from a defendant's choice not to take the stand and thereby use the defendant's exercise of the privilege as affirmative evidence of his guilt. It did not create some highly virulent constitutional contagion into whose remotest proximity advocates dare stray only at extreme peril.

For a prosecutor to compare the great weight of the State's evidence with the insubstantiality or non-existence of the defense evidence is just what it says it is, a comment on the relative weight of the evidence and not an invitation to make the State's evidence even weightier by adding to it the defendant's trial decision not to testify. To comment on a defendant's "inexplicable behavior" during or immediately after the commission of the crime legitimately directs the fact finder's attention to the inexplicable behavior itself and not to the defendant's trial strategy not to explicate it. *Griffin v. California* is aimed at a clear-cut and forbidden line of argument and is not concerned with the hypersensitive response of the most timorous ear to any remote noise in the night. This contention does not even make it into the relevant solar system.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*